**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL NO. 1:06CV367**

| | | |
|---|---|---|
| **OLIN CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND** |
| | ) | **O R D E R** |
| **P. H. GLATFELTER COMPANY, a/k/a** | ) | |
| **"Glatfelter" and d/b/a "Glatfelter** | ) | |
| **Company,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on motion of Plaintiff Olin

Corporation (Olin) for summary judgment; Defendant P. H. Glatfelter

Company (Glatfelter) has filed a response opposing the relief sought.  For

the reasons stated herein, Olin's motion is granted as to all issues except

for the matter of Olin's legal fees.


**I.  FACTUAL AND PROCEDURAL HISTORY**

Olin initiated this lawsuit against Glatfelter in November 2006.  ***See***

**Complaint, filed November 6, 2006; Amended Complaint, filed**

**November 15, 2006.**  Pleadings filed by the parties allege the following

facts.  From 1949 to 1985, Olin operated a paper mill (the Mill) in the town

of Pisgah Forest, North Carolina.  **Amended Complaint,** *supra***, at 2.**  The

Mill's campus, which covered several hundred acres, contained at least 75

buildings.  **Exhibit K, Declaration of Jack S. Garren,** *attached to*

**Defendant's Motion for Discovery Conference, filed July 1, 2008, at 2.**

One of these buildings, a plant known as the Electro-Chemical

Building (ECB), produced elemental chlorine and sodium hydroxide

(collectively, caustic) for use in the Mill's pulp bleaching process.  **Answer**

**and Counterclaim, filed January 16, 2007, at 11.**  The caustic was

manufactured with equipment called Sorensen cells, which employed an

electrolysis process using liquid mercury cathodes.  *Id.*  The electrolysis

produced a waste byproduct containing mercury.

Olin's practice was to discharge the mercury-contaminated waste

into a nearby ditch, which drained into the Davidson River.  *Id.*  The

contaminated water then flowed down the Davidson River to the Mill's

aeration and stabilization basin (ASB), before continuing into the French

Broad River.[1]  *Id.* **at 11-12.**  In addition to spreading mercury through the

Mill's environs in this way, Olin's caustic production practices also caused

mercury to leak into the soil and groundwater beneath the ECB, from which

point the mercury proceeded into the greater ecosystem around the Mill

campus.  *Id.* **at 11;** *see also* **Exhibit 14, Deposition of Jim Tomlinson,**

*attached to* **Glatfelter's Memorandum of Law in Opposition to Olin's**

**Motion for Summary Judgment, filed June 13, 2008, at 104-06 (stating**

**that "I don't believe there was any one place [in the ECB] where [the**

**mercury] was being lost that could have been fixed and taken care of**

**the problem. . . .  [There were] a lot of places where it was being lost.**

**And I do recall just thinking it would be a horrendous problem to try**

**to tighten this place up.").**

In 1973, government entities began to investigate the Pisgah Forest

area for mercury contamination.  **Answer,** *supra***, at 12; Amended**

**Complaint,** *supra***, at 3.**   Around the same time, Olin shut down the ECB

and began to purchase its caustic from other sources.   **Answer,** *supra***, at**

_____

[1] All told, approximately 16-20 million gallons of water flowed from the ASB into the French Broad River every day.  **Exhibit 4, Pisgah Forest Environmental Disclosure Background Materials,** *attached to* **Glatfelter's Amended Counterclaims, filed November 16, 2007, at 9378.**

**11; Amended Complaint,** *supra*, **at 3.**  The Sorensen cells from the ECB were dismantled and buried at "Camp Strauss," a remote location on the Mill's large campus.  **Tomlinson Deposition,** *supra*, **at 55;** *see also* **Exhibit 4, Pisgah Forest Environmental Disclosure Background Materials (hereinafter, EDS),** *attached to* **Glatfelter's Amended Counterclaims, filed November 16, 2007, at 9376 (internal memo claiming that "[t]he remoteness of [Camp Strauss] on Olin's large parcel of land precludes any potential environmental problems").**  At the time, Olin's management believed that the Mill's mercury waste problem "was being taken care of by shutting down [the ECB]."  **Tomlinson Deposition,** *supra*, **at 236.**

In 1985, more than ten years after dismantling the ECB, Olin sold the Mill to RFS Ecusta, Inc. (Ecusta), a company whose management was largely comprised of Olin employees.  **Answer,** *supra*, **at 3; Amended Complaint,** *supra*, **at 3.**  These individuals continued to manage the Mill after the transfer of ownership.  **Answer,** *supra*, **at 3;** *see also* **Olin's Memorandum of Law in Support of Its Motion for Summary Judgment, filed May 21, 2008, at 4-5 (listing the individuals who managed the Mill before and after the transition period).**

The sale of the Mill was governed by a Purchase Agreement between Olin and Ecusta, dated July 24, 1985 (the Agreement).  **Exhibit A, Purchase Agreement, *attached to* Amended Complaint, *supra*, at 2.** In addition to setting forth the terms of the parties' asset purchase transaction, the Agreement included the following indemnity clause:

> 1.5 Consideration for Transfer of the Assets, Australian Assets and Stock.  In full consideration for the Assets, Australian Assets and Stock, and subject to the terms and conditions of this Agreement, Buyer shall on the Closing Date (except as provided below) deliver to Seller:
>
> . . . .
>
> (b) an instrument . . . in form and substance reasonably satisfactory to Seller, whereby Buyer shall assume and agree to be responsible for, to pay, perform and discharge, and to indemnify Seller against, all liabilities, obligations and indebtedness of Seller of any kind or nature, fixed or contingent, whether known or unknown as of the Closing Date, related to the Ecusta Division as they exist on the Closing Date or arise thereafter, including, without limitation, all . . . environmental liabilities (including, without limitation, all liabilities of Seller arising out of the disposal of waste or other matter on property being transferred to Buyer as part of the Ecusta Division or migration of waste or other matter therefrom, or disposal by the Ecusta Paper business of waste or other matter on property not constituting part of the Ecusta Division) . . . provided, however, that Buyer shall not assume or agree to be responsible for and does not agree to pay, perform, discharge, or to indemnify Seller against, any liability, obligation or indebtedness of Seller with respect to:

. . . .

(v) Claims by governmental authorities or non-governmental persons relating to alleged non-compliance with any environmental laws, regulations or ordinances, or to alleged personal injury or property damage, arising out of the disposal of waste or other matter prior to the Closing Date (1) by Seller on property not constituting part of the Ecusta Division, provided that waste or other matter are not sent by or from Buyer to such property after the Closing Date (Claims based on migration to any property of waste from property constituting part of the Ecusta Division, are not excluded by this clause (v)(1)), or (2) on the Pisgah Forest Plant Facility (including the Aerated Stabilization Basin) referred to in paragraph 9.2, but only if (A) the disposition of such waste or other matter is not referred to in the Environmental Disclosure Statement attached as Schedule 3.1(s) hereto, (B) the disposition of such waste or other matter took place prior to January 1, 1970, (C) the practice of disposing of the type of waste or other matter giving rise to the Claim did not continue after January 1, 1970, and (D) at the time such Claim is made, the only business conducted at the Pisgah Forest Plant Facility by Buyer since the Closing Date has been a cigarette paper and/or fine printing paper business[.]

**Purchase Agreement, *supra*, at 7-11.** Following its purchase of the Mill,

Ecusta continued papermaking operations at the site for two years.

In 1987, Glatfelter bought Ecusta, in the process assuming Ecusta's

obligations and liabilities with respect to the Mill. **Amended Complaint,**

**supra, at 3; Exhibit B, Letter from Patrick H. Zaepfel, *attached to***

**Amended Complaint, *supra*, at 2 (stating that Glatfelter "will abide by**

**the commitments it assumed when purchasing Ecusta").**  In 2001,

Glatfelter sold the Mill to a third party, Purico (IOM) Limited (Purico), and

some related entities.[2]  **Answer, *supra*, at 14.**  Purico shut down the Mill a

year later due to financial difficulties, and the property began to deteriorate.

*Id.*  Since that time the Mill campus has had several successive owners.

Its present owner is Davidson River Village.  **Motion for Discovery**

**Conference, *supra*, at 3.**

In January 2006, the North Carolina Department of Environment and

Natural Resources (DENR) notified Olin and Glatfelter that it had

conducted a site inspection of the Mill property under the auspices of the

United States Environmental Protection Agency (EPA), pursuant to the

_____

[2] Ecusta, Purico, Glatfelter, Olin, and other entities associated with
the Mill are frequent visitors in United States District Court for the Western
District of North Carolina.  ***See, e.g., Glatfelter v. Olin*, Case No.
1:08CV160; *In re RFS Ecusta, et al.*, Case No. 3:06CV386; *Cooper v.
P.H. Glatfelter Co.*, Case No. 3:05CV216; *Cooper v. Purico (IOM) Ltd.,
et al.*, Case No. 3:05CV215; *Cooper v. Purico (IOM), Ltd., P.H.
Glatfelter, RFS Ecusta, et al.*, Case Nos. 3:05CV213 and 3:05CV214;
*Cooper v. RFS Ecusta, Inc.*, Case No. 3:05CV212; *Paper Allied-Indus.
Chem. & Energy Workers Int'l Union et al. v. RFS Ecusta, Purico (IOM)
Ltd., P.H. Glatfelter, et al.*, Case Nos. 1:02CV224 and 1:02CV230.**

Comprehensive Environmental Response, Compensation and Liability Act

(CERCLA), 42 U.S.C. §§ 9601-9675.[3] **Exhibit C, Letter from Jim**

**Bateson,** *attached to* **Amended Complaint,** *supra***, at 1.** The report

generated by the site inspection indicated that the Mill met the necessary

criteria for listing on the EPA's National Priorities List (NPL).[4] *Id.*

Specifically, DENR identified five Recognized Environmental Concerns

(RECs) at the Mill site. The first REC on DENR's list was the ECB, "with its

associated mercury releases." **Exhibit C, Proposed Administrative**

**Settlement Agreement and Order on Consent,** *attached to* **Amended**

**Complaint,** *supra***, at 5.** The fifth REC was the ASB, into which much of

---

[3] The EPA has authorized DENR to oversee environmental response actions by liable parties at "NPL caliber" sites – that is, sites whose contamination appears serious enough to warrant listing on the EPA's National Priorities List. **Exhibit C, Letter from Jim Bateson,** *attached to* **Amended Complaint,** *supra***, at 1;** *see also* **40 C.F.R. § 300.515(a)(1) (describing EPA procedures for "enter[ing] into cooperative agreements or contracts with a state . . . to carry out Fund-financed response actions authorized under CERCLA").**

[4] The NPL is the EPA's "list of priority releases for long-term remedial evaluation and response." **40 C.F.R. §300.425(b).** Only those releases on the NPL are "considered eligible for Fund-financed remedial action." *Id.* **§ 300.425(b)(1);** *see also id***. § 300.425(c) (describing method for determining a polluted site's eligibility for the NPL).**

the mercury contamination from the ECB had flowed.[5] *Id.* **at 6.** In order to implement cleanup of the ECB, the ASB, and the other RECs, DENR proposed a settlement agreement, which named both Olin and Glatfelter as owners, operators, and/or responsible parties associated with the Mill site, and imposed liability for the cleanup on both Olin and Glatfelter. *Id.* **at 4.**

Following DENR's proposal, Olin and Glatfelter each filed suit against the other. Glatfelter's suit against Olin has been stayed pending the outcome of summary judgment proceedings in the instant litigation. ***See Order, filed June 18, 2008, at 1-2 (Case No. 1:08CV160).*** In this lawsuit, Olin makes two claims for relief. First, it requests a declaratory judgment "holding that the Defendant is liable for the clean-up of the alleged mercury contamination identified in REC 1 [mercury from the ECB] and, potentially, REC 5 [mercury in the ASB]." **Amended Complaint,** *supra***, at 7.**

---

[5] The other three RECs named by DENR are a series of landfills. **Proposed Administrative Settlement Agreement,** *supra***, at 5-6**. These landfills are not at issue in this litigation because Glatfelter has already agreed to indemnify Olin for the costs incurred in their cleanup. **Amended Complaint,** *supra***, at 4.** As to the ASB, Glatfelter has agreed to indemnify Olin for all cleanup costs except those associated with mercury contamination. *Id.*

Second, Olin requests "damages in an amount equal to its legal fees incurred in this action and in responding to the NCDENR." *Id.* **at 8.**

Glatfelter has also counter-claimed against Olin for fraud, negligent misrepresentation, and unfair and deceptive trade practices. **Answer, *supra*, at 16-19.** These claims arise out of Olin's alleged non-disclosure and misrepresentation of environmental conditions at the Mill in the Agreement and accompanying Environmental Disclosure Statement (EDS). *Id.*

Olin has now moved for summary judgment on all issues. Glatfelter opposes summary judgment and asserts that the case contains genuine issues of material fact that warrant a trial.


## II.  STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact, and judgment for the moving party is warranted as a matter of law. **Fed. R. Civ. P. 56(c).** "A genuine issue [of fact] exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" ***Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).** In

considering a motion for summary judgment, the Court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.*

By reviewing substantive law, the Court may determine what matters constitute material facts. *Anderson*, **477 U.S. at 248.** "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "The party seeking summary judgment has the initial burden to show a lack of evidence to support the nonmoving party's case." *Shaw*, **13 F.3d at 798.** If that showing is made, the burden then shifts to the nonmoving party who must convince the court that a triable issue does exist. *Id.* A "mere scintilla of evidence" is not sufficient to defeat a motion for summary judgment. *Id.*

Accordingly, in considering the facts of the instant case for purposes of Olin's summary judgment motion, the Court will view the record in the light most favorable to Glatfelter, the nonmoving party.

## III.  DISCUSSION

### A.  Declaratory Judgment

### 1.  Issues Posed by the Agreement

Olin first requests a declaratory judgment[6] holding that, under the Agreement, Glatfelter must indemnify Olin for the costs of cleanup of the mercury contamination described in RECs 1 and 5.  In analyzing Olin's request, the Court is called to construe what is, in effect, an exception to an exception within the Agreement.

To summarize, the Agreement provides that Glatfelter's predecessor in interest, Ecusta, will indemnify Olin "against all . . . environmental liabilities."  **Purchase Agreement,** ***supra*, at 8.**  There is an exception, however, for "[c]laims . . . arising out of the disposal of waste or other matter prior to the Closing Date by [Olin]."  ***Id.* at 10.**  Had the Agreement stopped here, Glatfelter would be the clear winner in this action.  However, the Agreement proceeds to make an exception to the "disposal" exception.

---

[6] The Court is authorized to issue such a judgment by 28 U.S.C. § 2201(a), which provides:  "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

*Id.* **at 10-11.** Specifically, it provides that Olin will be entitled to indemnification from Ecusta for environmental liabilities arising out of its "disposal of waste or other matter" if four conditions are met. Of these four conditions, the parties' arguments have centered solely on the first condition, which states that Olin will not be entitled to indemnification if "the disposition of such waste or other matter is not referred to in the [EDS] attached as Schedule 3.1(s) hereto."[7] *Id.* **at 10.**

Olin argues that, since the EDS does refer repeatedly to Olin's disposition of mercury, Olin is entitled to indemnification for costs of cleaning up the mercury contamination described in RECs 1 and 5. Glatfelter, on the other hand, contends that the EDS does not refer to Olin's mercury contamination with sufficient specificity to warrant the imposition on Glatfelter of a duty to indemnify.

_____

[7] As noted above, the other three conditions that must be met in order for Olin to receive indemnification are: "(B) the disposition of such waste or other matter took place prior to January 1, 1970, (C) the practice of disposing of the type of waste or other matter giving rise to the Claim did not continue after January 1, 1970, and (D) at the time such Claim is made, the only business conducted at the Pisgah Forest Plant Facility by Buyer since the Closing Date has been a cigarette paper and/or fine printing paper business[.]" *Id.* **at 10-11.** It is undisputed that these three conditions are met with respect to the pollution described in RECs 1 and 5.

## 2. Applicable Principles of Law

The Court will begin its analysis by noting the Agreement's choice-of-law clause, which states: "This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York." **Purchase Agreement, *supra*, at 72.** Accordingly, the Court will look to New York's contract construction rules for guidance in analyzing the propriety of Olin's declaratory judgment request.

New York courts "have repeatedly applied 'the familiar and eminently sensible proposition of law [ ] that, when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.'" ***Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879 (2004) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990)) (alterations in original).** "It is only where the language of a contract is ambiguous, uncertain or susceptible of more than one construction that a court may interfere to construe the language of the agreement." ***Contacare v. Ciba-Geigy Corp.*, 841 N.Y.S.2d 218 (table), 2007 WL 1299208 at \*3, 2007 N.Y. Misc. LEXIS 3155 at \*3 (N.Y. Sup. Ct. 2007) (citing *Gans v. Aetna Life Ins. Co.*, 214 N.Y. 326, 330, 100 N.E.**

**443, 444 (1915) ("Where the parties by their words have left no fair reason for doubt, there is no just or defensible excuse for construction.")).** According to the New York Court of Appeals, this policy of reluctance to construe serves to "impart[] stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses . . . [and] infirmity of memory." ***Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 548, 658 N.E.2d 715, 717 (1995) (internal quotation marks omitted) (second and third alterations in original).**

New York's highest court has also repeatedly emphasized the special import of these rules "'in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length.'" ***Vermont Teddy Bear Co.*, 1 N.Y.3d at 475, 807 N.E.2d at 879 (quoting *Wallace*, 86 N.Y.2d at 548, 658 N.E.2d at 717).** "In such circumstances, 'courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'" ***Id.* (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 385 N.E.2d 566, 572 (1978)).**

In addition to these special policies governing real estate contracts, the New York Court of Appeals has also adopted specific rules of contract construction concerning indemnification clauses.  Specifically, courts are instructed to construe a contractual indemnification agreement strictly, in order "to avoid reading into it a duty which the parties did not intend to be assumed."  *Hooper Assocs., Ltd. v. AGS Computers, Inc.***, 74 N.Y.2d 487, 491, 548 N.E.2d 903, 905 (1989).**  "The promise [to indemnify] should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances."  *Id.* **at 491-92, 548 N.E.2d at 905.**   That is, a court cannot find a duty to indemnify absent manifestation of an "unmistakable intention" to indemnify.  *Heimbach v. Metro. Transp. Auth.***, 75 N.Y.2d 387, 392, 553 N.E.2d 242, 246 (1990) (internal quotation marks omitted).**

Finally, it is well-established in New York, as elsewhere, that "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."  *Reiss v. Fin. Performance Corp.***, 97 N.Y.2d 195, 199, 764 N.E.2d 958, 961 (2001) (internal quotation marks omitted).**  It is also true, however, that "once a party to a contract has

made a promise, that party must perform or respond in damages for its failure, even when unforeseen circumstances make performance burdensome . . . . [T]he purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances." ***Kel Kim Corp. v. Cent. Mkts., Inc.***, **70 N.Y.2d 900, 902, 519 N.E.2d 295, 296  (1987) (declining to allow a defense based on impossibility of performance absent truly exigent circumstances, such as the destruction of the subject matter of the contract).**

### 3.  Analysis of the Agreement and the EDS

With these principles in mind, the Court now turns to an analysis of the instant contract.  According to the parties' framing of the issues, this analysis hinges on whether "the disposition of" the mercury described in RECs 1 and 5 "is . . . referred to" in the EDS.  **Purchase Agreement, *supra*, at 10.**

### a.  Ambiguity

Both Olin and Glatfelter have devoted much space in their briefs to dissecting nuances of meaning in the words "refer" and "disposition."  The

undersigned, however, remains unconvinced that either of these common words is "ambiguous, uncertain or susceptible of more than one construction," and thus deserving of interpretation. **Contacare, 2007 WL 1299208 at \*3, 2007 N.Y. Misc. LEXIS 3155 at \*3.** Nor, indeed, do the other relevant parts of the Agreement appear to be suffering markedly from any of these infirmities, such that the Court "may interfere to construe the language of the agreement." *Id.* Rather, "refer," "disposition," and the rest of the words in the Agreement and the EDS must be given effect in accordance with their plain, ordinary meanings. **See Elmira Teachers' Ass'n ex rel. Martin v. Elmira City Sch. Dist., 861 N.Y.S.2d 195, 197 (N.Y. App. Div. 2008) (noting that "a contract should be interpreted according to its plain and ordinary meaning").**

### b. References to Mercury Disposition in the EDS

Once it is established that there is no need for the Court to parse the language of the Agreement and the EDS, the construction of these documents becomes relatively straightforward. The EDS, a lengthy document appended to the Agreement, is a hodgepodge of environmental documents, permits, maps, data tables, and internal memoranda spanning

several decades.[8]  **EDS, *supra*.**  The EDS leads off with this statement at

the top of its first page:

> This disclosure statement briefly summarizes the environmental
> status of the paper mill and film operations located at Olin
> Corporation's facility in Pisgah Forest, North Carolina.
> Although the information listed below is given to the knowledge
> of Officers of Seller (as defined in the Purchase Agreement
> between Olin Corporation and Ecusta Corporation), it should be
> noted that *from the inception of plant operations in 1939, a
> wide variety of materials were handled* (solvents, lead,
> asbestos, *mercury from the chlor alkali plant*, etc.).  *Therefore,
> any environmental assessment must be tempered with the
> knowledge that such materials may have been disposed of at
> any of the sites discussed, or on any other location on or off the
> property*.

--------------------

[8] The Court notes that each party has filed its own version of this
crucial document.  What is more, the two versions differ significantly from
each other.  **Compare Exhibit G, *attached to* Olin's Amended
Complaint, *supra* (144 pages), *with* Exhibit 4, *attached to* Glatfelter's
Amended Counterclaims, *supra* (177 pages).**  The undersigned is
unable to ascertain whether this difference is due to a bookkeeping
oversight, whether it represents a genuine factual dispute between the
parties, or whether it is a result of deliberate obfuscation by one or both
sides.  The parties' pleadings do not mention the disparity, and the Court
cannot tell which version represents the true EDS (if, in fact, either does).
For purposes of this Order, the Court will utilize Glatfelter's version.  This
decision reflects the summary judgment standard of review, which directs
the Court to view the evidence in the light most favorable to Glatfelter, the
non-moving party.

*Id.* **at 9347 (emphasis added).** The first section of the EDS later states:

"The attached background material should be read in connection with this

statement." *Id.* **at 9351.**

Explicit evidence of mercury pollution from the ECB follows later in

the EDS, in an internal Olin memo dated February 3, 1982:

> The chlor-alkali plant is believed to have been installed very
> soon after the paper plant was built in 1938. The paper
> operation was very small until late 1940's, when the period of
> expansion began. Gussman [Olin's Environmental Director]
> says the State of North Carolina checked the Davidson River
> up stream and down stream from the chlor-alkali plant outfall
> and found some mercury in the sediment below the outfall
> (within the last few years). He does not believe that a study of
> fish mercury has been undertaken.

*Id.* **at 9384.**

The EDS also alludes, albeit obliquely, to contamination at and from

the ASB (due to unnamed chemicals) in another internal Olin memo dated

February 12, 1982:

> Areated [sic] Stabilization Basin (ASB) – This large secondary
> treatment system achieves BOD and COD removal of the
> primary clarifier overflow, and the resulting effluent is
> discharged to the French Broad River (approximately 16 to 20
> million gallons per day). The solids that are formed haven't
> been tested for RCRA toxicity. They are accumulating in this
> basin, and there are no plans to remove them.

*Id.* **at 9378.**

Also, the final section of the EDS, labeled "Miscellaneous Data," is –

despite its title – concerned exclusively with mercury pollution. *Id.* **at 9516-**

**21.** The section contains an internal memo exchanged between officers of

Olin, dated March 18, 1982, which states that EPA reports from 1970-71

"indicate downstream bottom sediment in the Davidson River ranged

between 0.14 to 0.37 parts per million (ppm) of mercury, downstream fish

samples . . . varied from 0.1 to 0.2 ppm of mercury in trout, 0.33 - 0.50 ppm

in bream, 0.26 - 0.33 ppm in catfish, and as high as 0.6 ppm in suckers."

*Id.* **at 9517.** Two additional internal memos from 1970 are attached to the

1982 memo, and both of these contain reports of fish and mud studies –

apparently conducted by Olin – which mostly confirm EPA's reports. *Id.* **at**

**9518-21 (listing fish species exhibiting various levels of mercury and**

**showing that sedimentary mercury was present in less than 0.03 ppm**

**upstream of the Mill and 0.12-0.17 ppm downstream)**.[9]

------------------------

[9] Glatfelter argues that in the 1970s, "the EPA's permissible limit on
mercury levels in fish was 1.0 ppm" and that the fish and mud studies in
the final section of the EDS "do not reveal mercury readings at a level that
would have caused Glatfelter concern, nor do they identify extensive
mercury contamination." **Glatfelter's Memorandum of Law in
Opposition to Summary Judgment, filed June 13, 2008, at 13 n.8.** This
argument, however, does not change the fact that the memoranda in the
miscellaneous data section unmistakably indicate mercury disposition from
the Mill.

The preceding references to mercury pertain directly to RECs 1 and 5.  In addition to these direct references, additional allusions to mercury disposition are scattered throughout other sections of the EDS.[10]  For example, the section which describes hazardous waste streams contains numerous references to Olin's periodic disposal, in a landfill, of "mercury tubes" used in cellophane manufacturing.  *Id.* **at 9365, 9366, 9371, 9372 (listing  four instances of mercury tube disposal).**  Another section likewise indicates the presence of trace amounts of mercury in a landfill on the Mill campus.  *Id.* **at 9405.**  Mercury is also discussed throughout the EDS in connection with Camp Strauss.[11]  *Id.* **at 9349 (summary of on-site waste disposal sites listing Camp Strauss as being "used in 1973 for disposal of demolition debris resulting from the dismantling of a mercury cell chlor alkali plant");** *id.* **at 9376 (description dated February 12, 1982, of the "[d]emolition debris from a mercury cell caustic/chlorine plant" buried at Camp Strauss);** *id.* **at 9385**

---

[10] It is not entirely clear how many of these additional mentions of mercury are relevant to RECs 1 and 5.  It is possible that they refer to additional mercury disposition beyond what is at issue in this lawsuit.

[11] According to Glatfelter, Camp Strauss was cleaned, at Glatfelter's expense, in 1994.  **Glatfelter's Memorandum of Law in Opposition to Summary Judgment,** *supra*, **at 14.**

(description dated February 3, 1982, of "concrete rubble buried in two parallel ditches . . . There is no way to check for leachate . . . Gussman says that not only was mercury-contaminated concrete rubble, but also mercury-contaminated soil, placed at this location."); *id.* at 9394 (undated survey indicating trace amounts of mercury at Camp Strauss); *id.* at 9446 (undated memo noting that "a quantity of concrete rubble produced as a result of a major reconstruction project in the Paper Mill was buried at [Camp Strauss] in a clay lined area").

### c. Effect of the EDS's References to Mercury

New York's policy of strict interpretation for indemnification clauses directs the Court to examine whether a intention to indemnify "can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." ***Hooper*, 74 N.Y.2d at 491-92, 548 N.E.2d at 905.** Even when the disputed facts are viewed in the light most favorable to Glatfelter, the undisputed facts satisfy the stringent *Hooper* standard. When, pursuant to *Hooper*, the EDS is viewed in its entirety, it is apparent that its terms describe the same mercury disposition

which is the subject of RECs 1 and 5.[12]  The EDS, in its very first

paragraph, states that "mercury from the chlor alkali plant . . . may have

been disposed of at any of the sites discussed, or on any other location on

or off the property."  **EDS, *supra*, at 9347.**  Should the non-committal

phrase "*may* have been disposed of" leave any lingering doubt in the

reader's mind about the EDS's meaning,[13] the EDS also includes (in two

different places) descriptions of – and scientific data on – fish and mud

studies showing mercury contamination in the Davidson River and other

surrounding waterways.  ***Id.* at 9384, 9517-21.**  These studies

---

[12] The question of liability for any mercury contamination at the Mill *not* described in RECs 1 and 5 is not presently before the Court, and no opinion is expressed thereon.

[13] Glatfelter points out that "New York courts have found that a statement in a contract that hazardous substances 'may' be present at a site is not sufficient to provide notice to a buyer that such materials are actually present."  **Glatfelter's Memorandum of Law in Opposition to Summary Judgment, *supra*, at 11 (citing *New York v. Westwood-Squibb Pharm. Co.*, 2004 WL 1570261 at \*1, 2004 U.S. Dist. LEXIS 13841 at \*1-2 (W.D.N.Y. 2004) (unpublished)).**  *Westwood-Squibb*, however, involved the allocation of CERCLA liability pursuant to a real estate contract which, unlike the Agreement presently under consideration, contained no environmental indemnification clause at all.  The EDS's numerous other references to mercury also distinguish this case from *Westwood-Squibb*.

unmistakably reveal that mercury from the Mill was entering the ecosystem surrounding the Mill, whether intentionally or not.

As to the ECB (REC 1): the February 3, 1982, memo from the EDS specifically recites the existence of sedimentary mercury downstream, but not upstream, from the ECB's outfall.[14] *Id.* **at 9384.** Other memos in the EDS echo these findings with hard data. *Id.* **at 9517-21 (listing mercury levels found in various species of fish who were caught downstream of the Mill).** As to the ASB (REC 5): its contamination is elaborated upon in the February 12, 1982, memo's discussion of the accumulation of unnamed, untested solids. Furthermore, the pollution of the ASB with mercury may also be easily inferred from the fact that mercury was in the ECB's outfall from the Davidson River – because the Davidson River flows directly into the ASB. Finally, as to the other times mercury is mentioned in the EDS, such as the "mercury tubes" and the burial of the Sorensen cells at Camp Strauss: although these dispositions do not appear to be directly

---

[14] Glatfelter contends that the study described in the February 3, 1982, memo "does not in any way indicate that Olin disposed of mercury at that location." **Glatfelter's Memorandum of Law in Opposition to Summary Judgment,** *supra***, at 12 (citing EDS,** *supra***, at 9384).** This argument defies common sense.

relevant to either REC 1 or REC 5, they nonetheless serve to reinforce the cautions contained in the EDS's initial paragraph.

While these considerations, standing alone, give ample evidence of the parties' intent, "the surrounding facts and circumstances" also support the conclusion that the parties meant for Ecusta to indemnify Olin for the mercury disposition described in the RECs. **Hooper, 74 N.Y.2d at 491-92, 548 N.E.2d at 905.** The undisputed evidence shows that several of the key managers who operated the Mill for Olin came together to form Ecusta and purchase the Mill. These individuals continued to serve in their same positions after the change of ownership. For example, the President of Olin's local division became the President of Ecusta; Olin's local chief legal officer became chief legal officer for Ecusta; and, most notably, Olin's local environmental director continued as Ecusta's environmental director.[15] **Olin's Memorandum of Law in Support of Summary Judgment, filed May 21, 2008, at 5.** These key individuals provided a continuity of knowledge between the two companies, making it more difficult for Ecusta (and Glatfelter, its successor) to claim that the EDS's references to

_____

[15] This environmental director's name was Robert Gussman, and he is listed as either a sender or a recipient on many of the EDS documents pertaining to mercury. ***E.g.,* EDS,** *supra*, **at 9384, 9389, 9517.**

mercury do not designate the mercury described in RECs 1 and 5 with sufficient specificity to put Ecusta on notice. **Cf. United States v. Hooker Chems. & Plastics Corp., 850 F. Supp. 993, 1059 (W.D.N.Y. 1994) (in the related but not identical context of *caveat emptor*, noting that "[e]ven for latent defects, the seller's duty terminated when a new owner discovered or should reasonably have discovered and had a reasonable opportunity to abate the condition"); *Nat'l R.R. Passenger Corp. v. N.Y. City Hous. Auth.*, 819 F. Supp. 1271, 1279 (S.D.N.Y. 1993) (similar holding in the context of nuisance law).**

Glatfelter nonetheless argues, understandably, that Olin was responsible for 100 percent of the mercury pollution described in the RECs, and it is simply unfair to foist the indemnification duty upon Glatfelter, who did not contribute to the mercury pollution at all. **See, e.g., *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir. 1988) (noting that considerations of equity should enter into the calculus of response cost allocation under CERCLA).** Although the undersigned recognizes these equitable considerations, the Court lacks the authority to rewrite an unambiguous contract, or indeed to second-guess that contract's wisdom. The Agreement and the EDS were

"negotiated between sophisticated, counseled business people negotiating at arm's length." **Vermont Teddy Bear Co., 1 N.Y.3d at 475, 807 N.E.2d at 879 (internal quotation marks omitted).** As noted above, the "purpose of contract law is to allocate the risks that might affect performance." **Kel Kim Corp., 70 N.Y.2d at 902, 519 N.E.2d at 296.** Presumably, the pollution risks disclosed in the EDS were factored into the purchase price and other contract terms described in the Agreement. Absent any allegations of unconscionability, it is beyond this Court's purview to pluck a clear term from its context in the Agreement and pass judgment now, more than twenty years later, on its equity. Instead, the Court must enforce the rule that, "once a party to a contract has made a promise, that party must perform or respond in damages for its failure, even when unforeseen circumstances make performance burdensome." **Id.**

For these reasons, the Court concludes there are no genuine issues of material fact with respect to declaratory judgment, and that, as a matter of law, the Agreement with its accompanying EDS obligated Ecusta to indemnify Olin for the costs of cleanup described in RECs 1 and 5.[16]

---

[16] This holding is necessarily limited to an analysis of the parties' rights and duties under the Agreement. At this time, the Court does not express any opinion on the issue of the parties' liability under CERCLA.

Glatfelter, as Ecusta's successor, is similarly bound. Olin is entitled to a declaratory judgment to this effect, in accordance with 28 U.S.C. § 2201(a).

## B. Glatfelter's Counterclaims

The Court will next address Glatfelter's counterclaims against Olin, which include fraud, negligent misrepresentation, and unfair and deceptive trade practices. These claims all arise from Glatfelter's contention that Olin knew or should have known of the extensive mercury contamination described in RECs 1 and 5, but failed to accurately disclose this fact to Ecusta at the time of the Agreement.

While the parties chose New York law to govern their contract, they do not dispute that questions concerning the validity of the Agreement should be determined by the law of the jurisdiction in which the Agreement was made, namely, North Carolina. *See Keywell Corp. v. Weinstein*, 33 **F.3d 159, 163 (2d Cir. 1994) (making a similar observation).**

In North Carolina, a cause of action for fraud must be brought within three years of "discovery by the aggrieved party of the facts constituting the fraud." **N.C. Gen. Stat. § 1-52(9).** "'[D]iscovery' [of fraud] means either

actual discovery or when the fraud should have been discovered in the exercise of reasonable diligence." **White v. Consolidated Planning, Inc., 166 N.C. App. 283, 307, 603 S.E.2d 147, 163 (2004) (internal quotation marks omitted).** "Ordinarily, the question of when fraud, in the exercise of reasonable diligence, should be discovered is a question of fact for the jury. When, however, the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so, the absence of reasonable diligence is established as a matter of law." *Id.* **(internal quotation marks omitted).**

Glatfelter claims that it "was not required to review every single document in Olin's files" when it acquired the Mill and that it "could not have discovered the facts giving rise to its [counter]claims until the Spring of 2006, when, for the first time, it became aware of numerous internal Olin memoranda demonstrating Olin's knowledge of extensive mercury contamination at the Mill." **Glatfelter's Memorandum of Law in Opposition to Summary Judgment,** *supra***, at 31-32.** Allegedly, "Glatfelter did not discover [these documents] until . . . the investigation by the EPA and DENR into mercury contamination at the Mill triggered

Glatfelter to review old project engineering files to learn about the ECB operations." *Id.*

In this case, as in *White*, the principal question in summary judgment is whether Glatfelter has "offered sufficient evidence to give rise to an issue of fact regarding the imputation of knowledge." **White, 166 N.C. App. at 307, 603 S.E.2d at 163.** The Court holds that it has not. Even assuming that the EDS did not adequately disclose the mercury contamination described in RECs 1 and 5, it is undisputed that the old files which supposedly brought to light Olin's alleged fraud passed into Ecusta's custody during Ecusta's ownership from 1985-1987, and then into Glatfelter's custody beginning in 1987, when it purchased the Mill from Ecusta. *See* **Glatfelter's Memorandum of Law in Opposition to Summary Judgment,** *supra***, at 32 (conceding that the documents in question were located on the Mill's campus this whole time).** It is proper, as a matter of law, to impute knowledge of those documents' contents to Ecusta, and later, Glatfelter, who were the documents' sole custodians. *See Sullivan v. Mebane Packaging Group, Inc.***, 158 N.C. App. 19, 28, 581 S.E.2d 452, 459 (2003) (noting that the Fourth Circuit has held that knowledge of information should be imputed to**

**investors who have in their possession documents apprising them of the risks attendant to the investments); 18B Am. Jur. 2d** *Corporations* **§ 1497 ("Directors have been regarded as chargeable with knowledge of facts which the corporate books and records disclose. Indeed, they have a duty to consult such books and records.").** The continuity of key personnel between Olin and Ecusta – particularly the environmental director – also strongly supports the imputation of this knowledge to Ecusta. For these reasons, the Court is of the opinion that Glatfelter and Ecusta had "both the capacity and opportunity to discover the [alleged] fraud," beginning at the time they each acquired the Mill. *White***, 166 N.C. App. at 307, 603 S.E.2d at 163.** Their failure to exercise reasonable diligence is, therefore, established as a matter of law. *Id.*

Negligent misrepresentation also has a three-year statute of limitations and a discovery requirement similar to that of fraud. **N.C. Gen. Stat. § 1-52(5);** *Barger v. McCoy Hillard & Parks***, 346 N.C. 650, 665-66 488 S.E.2d 215, 224 (1997).** Likewise, the North Carolina Court of Appeals has held that when an unfair and deceptive trade practices claim is based on fraud, the four-year limitations period begins to run when the plaintiff discovers or should have discovered the fraud. *Hunter v.*

***Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 485, 593 S.E.2d 595, 601 (2004); *Nash v. Motorola Commc'n & Elec., Inc.*, 96 N.C. App. 329, 331, 385 S.E.2d 537, 538 (1989).**

In short, the window of time is long gone in which Glatfelter could have, in the exercise of reasonable diligence, acted on the documents which (it alleges) give rise to its three counterclaims. Therefore, Olin is entitled to summary judgment on these claims.


## C. Olin's Legal Fees

Finally, the Court must address whether Olin is entitled to be reimbursed for "its legal fees incurred in this action and in responding to the NCDENR." **Amended Complaint, *supra*, at 9.**

This action was filed pursuant to the federal Declaratory Judgment Act, and the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (conferring jurisdiction in diversity cases). "In an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed." ***Sec. Ins. Co. of Hartford v. Campbell Schneider 7***

***Assoc.*, LLC, 481 F. Supp. 2d 496, 500 (D.S.C. 2007) (citing *Culbertson v. Jno. McCall Coal Co.*, 495 F.2d 1403, 1406 (4th Cir.1974)) (internal quotation marks omitted).**  Therefore, the Court will look to North Carolina law to decide the issue of Olin's legal fees, as this state is both the forum state and the state in which the Agreement was made.

North Carolina has adopted the Uniform Declaratory Judgment Act, which states that "[i]n any [declaratory judgment] proceeding . . . the court may make such award of costs as may seem equitable and just." **N.C. Gen. Stat. § 1-263.**  North Carolina courts have interpreted this statute as placing an award of legal costs and fees within the trial court's discretion. ***Heatherly v. State*, __ N.C. App. __, __, 658 S.E.2d 11, 18 (2008).**  Here, this litigation – despite its factual complexity – boils down to a simple matter of contract interpretation, and the Court believes that in such cases the most just outcome is for each party to bear its own legal fees.  Olin's request for fees and costs will therefore be denied.

## IV.  ORDER

**IT IS, THEREFORE, ORDERED** that Olin's motion for summary judgment is hereby **GRANTED** as to both the declaratory judgment claim and as to Glatfelter's counterclaims.

**IT IS FURTHER ORDERED** that Olin's request for legal fees is hereby **DENIED**.

A Judgment is entered herewith.

Signed: October 14, 2008

Lacy H. Thornburg
United States District Judge